UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>SHANE MAURITZ VANDERGROEN,<br>Defendant. | Case No. 18-cr-00133-PJH-1<br>**ORDER DENYING MOTION TO SUPPRESS**<br>Re: Doc. No. 14 |

On August 15, 2018, the court held a hearing on the motion of defendant Shane Mauritz Vandergroen to suppress all fruits of his seizure and arrest, including statements made by defendant and evidence obtained during the course of his seizure and arrest. Doc. no. 14. Having considered the relevant authority, the papers, the evidence in the record and the argument of counsel, the court DENIES the motion to suppress.

**I. Background**

Defendant was arrested by Concord Police Department (CPD) officers on February 18, 2018. Defendant was pulled over in a vehicle stop by CPD officers who had received a dispatch call of a male suspect with a pistol seen at the Nica Lounge in downtown Concord. Police searched defendant's car and found a 9mm semi-automatic handgun loaded with 11 bullets. Police arrested defendant for carrying a concealed weapon in a vehicle in violation of Cal. Penal Code § 25400(a)(1), possessing firearm with prior violent offense conviction in violation of § 29900(a)(1), and carrying loaded firearm on person/vehicle in a public place in violation of § 25850(a). Defendant is

charged here with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).

### A. 911 and Dispatch Calls

Witness 2 called 911 at about 11:27 p.m. on February 17, 2018, to report that a man with a gun in his waistband was seen around Nica Lounge. As reflected in the recorded 911 call, which started at about 11:27 p.m., Witness 2 gave his name, identified his position, indicated that he was calling from Nica Lounge, and reported a gentleman in the back parking lot next to Pizza Guys who was seen with a gun on his person: "a couple of customers said that he had a pistol on him, a gun on him. . . . 3 patrons coming into the Lounge . . . 3 girls in the back said they saw the pistol on him. . . . he's taking off running right now . . .he's in the parking lot behind the blue tattoo place [DV8]. . . he's jumping into a car right now. . . Black car. . . it's a sedan. . . 4-door. . . The officers went the wrong way. He's still in the parking lot. . . Crown Vic. He's turning right on Concord Avenue. . . He's going toward the police department." Doc. no. 21-1 (Sanchez Decl.), Ex. 1 (filed under seal). Witness 2 stayed on the phone with Concord police dispatch until CPD pulled over defendant. Witness 2 repeated his full name and gave his phone number to dispatch before hanging up. Both Witness 2 and another eyewitness were later interviewed by an FBI agent. Sanchez Decl., Ex. 2 (302 report of Witness 2 interview); doc. no. 15 (Matthews Decl.), Ex. B (302 report of Witness 1 interview).

The call history report shows that at about 11:28 p.m., dispatch alerted officers that "patrons think they saw a HMA blu warriors logo carrying a PISTOL." Doc. no. 21-2 (King Decl.), Ex. 2. The recorded dispatch call reflects the following communications:

- The dispatch operator directed responding officers as follows: "1907 Salvio. Nica Lounge. 3 patrons think they saw an HMA with a blue sweatshirt on carrying a pistol. We're getting further. . . . HMA wearing a blue sweatshirt with a Warriors logo on it. . . currently IFO Pizza Guys. . . . no 4-15 prior to patrons seeing the male with a pistol. 3 females say they saw it on him. We're still getting further. . . . Subject is running toward DV8 Tattoos and

2

just got into a black vehicle. . . getting into a 4-door sedan, black in color . . ." Doc. no. 21-2 (Plummer Decl.), Ex. 1 (radio dispatch recording).

- Officer reports "we're gonna do a high-risk car stop." *Id.* at 3:33.
- Officer reports "we will take the K-9." *Id.* at 4:58.
- Officer reports "we're gonna pause until the dog gets up here. He's having . . . he's not cooperating with the commands." *Id.* at 5:30.

**B.    Vehicle Stop and Arrest**

At about 11:31 p.m., multiple CPD officers conducted a high-risk traffic stop of defendant's black Ford Crown Victoria car. The parties have submitted several police reports detailing defendant's stop and arrest. Doc. nos. 15 and 21. The government has also submitted declarations by several of the responding officers, which are summarized below.

**1.    Sergeant Kyle Colvin**

At 11:28 p.m., Sgt. Colvin was informed by police dispatch that a Hispanic Adult male suspect wearing a blue sweater with the Warriors logo was observed with a firearm outside the Nica Lounge. Sgt. Colvin responded to the dispatch report and while he was driving to the Nica Lounge location, Concord dispatch provided updates of the suspect's location. A civilian witness called out to him while he was driving near the Nica Lounge, and alerted Sgt. Colvin to the suspect's vehicle.

At about 11:31 p.m., Colvin conducted a high risk traffic stop. He believed that a high-risk stop was necessary based on the nature of the call and the high possibility that the man inside this car had a gun, giving him concern about the safety of the public and officers.

As the first one on the scene, Colvin stopped his car, got out, and pointed his weapon at defendant. Other officers arrived and pointed their weapon at defendant. The police dog on scene was out of the patrol car but did not bite defendant. Defendant was yelling at the officers and not obeying repeated commands.

After several minutes passed with defendant not complying with police commands, Colvin told Officer Plummer to approach defendant and handcuff him, since Plummer was on the left side which was the best vantage point to approach and handcuff defendant. Under CPD protocol, officers handcuff suspects during high-risk traffic stops because of the potential element of danger.

Based on information received by CPD dispatch that this suspect carried a firearm on his person,[1] and to make sure he could not access weapons inside the car, Colvin told Officer King to search the car for the firearm. Based on Colvin's training and experience, when Ofc. Plummer's pat-down search revealed that the gun was not on the suspect's person, as witnesses had reported seeing, Colvin believed that the gun was probably inside the car. After the loaded firearm was discovered in the car by Ofc. King, Colvin decided to place defendant under arrest and arranged for an officer to transport him to the police station. Doc. no. 21-4 (Colvin Decl.) ¶¶ 4-11 and Ex. 1 (Colvin Rpt.).

### 2. Officer Michael Plummer

Officer Plummer states that the CPD Lieutenant (watch commander) decided that a high-risk stop was warranted in this case. Plummer notes that defendant was talking back to officers, prolonging the vehicle stop. Plummer was asked to approach the suspect and handcuff him. Plummer holstered his firearm and approached defendant on foot; defendant was out of the car. Plummer handcuffed him, and defendant did not physically resist when being handcuffed.

Officer Plummer patted down defendant and found no weapons on him. Plummer handcuffed defendant sometime before 11:39 p.m., which is when Officer Alvarado

---

[1] Officer Colvin states in his declaration, at ¶ 9, that dispatch informed the officers that the suspect was seen brandishing a firearm. The dispatch recording dispels the characterization that defendant was reportedly brandishing a gun, but the 911 call and dispatch recording make clear that the responding officers were informed that defendant was seen by several people with a gun "on him." This information provided a sufficient basis to suspect that defendant was either brandishing a weapon or carrying a concealed weapon.

4

requested a wants and warrants check on defendant. After handcuffing defendant and finding no weapons on his person, Plummer walked him to the patrol car and sat him down in the back of the car. Plummer drove him to the CPD station, about half a mile from the vehicle stop. The call history shows that the request to tow the car was made at 11:47 p.m., indicating that the on-scene investigation was complete. Doc. no. 21-2 (Plummer Decl.) and Ex. 1 (CPD dispatch recording).

### 3. Officer Derrick King

Officer King responded to the dispatch report, which was first made at about 11:28 p.m., that a Hispanic Male Adult wearing a blue sweater with the Warriors logo on it was observed carrying a firearm in his waistband outside the Nica Lounge. Dispatch provided information that the suspect was observed getting into a black Crown Vic type of car heading east on Galindo Street, and Ofc. King recalls that two cars matching that description were seen leaving the area. At about 11:31 p.m., a traffic stop of one vehicle was initiated by Sgt. Graham, and Ofc. King covered him, but they realized it was not the correct car.

Sgt. Colvin located the suspect vehicle at about 11:31 p.m., and conducted a high risk traffic stop, but the suspect was non-compliant and was not detained until about 11:37 p.m. Ofc. King arrived about 11:36 p.m., and at about 11:42 p.m., he located the firearm in the vehicle; it was facing down in the center console with the barrel pointed toward the rear of the car, and the safety was off. He took photos of the gun and the car. He ran the serial number and found that the gun was not registered.

Officer Marcic contacted the witness and transported the witness to the scene. The witness identified defendant as the suspicious person carrying the firearm. Ofc. King interviewed defendant at CPD Jail. Doc. no. 21-3 (King Decl.) and Ex. 1 (King Rpt.).

### 4. Officer Marcic

Officer Marcic contacted the witness who called 911 in front of the Nica Lounge and took the witness's statement. At about 11:40 p.m., Ofc. Marcic drove with the witness to the defendant's location and conducted an infield lineup with the infield

admonishment that he was not required to make an identification. The witness "immediately identified Vandergroen as the male subject seen with a handgun in his waistband saying, 'Yup. That's the dude with the Warriors shirt.'" The witness signed a citizen's arrest for defendant, who was transported to CPD Jail for booking. Doc. no. 15, Ex. A (Marcic Rpt.).

### C. Post-Arrest Interview

Officer Plummer transported defendant to the CPD station and did not question him during the transport. Plummer Decl. ¶ 6. At about 12:20 a.m., February 18, 2018, Officer King interviewed defendant at the CPD station; the interview was video and audio recorded. Sanchez Decl., Ex. 3.

## II. Legal Standard

The United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches and seizures by law enforcement are presumptively unreasonable. *See Kyllo v. United States*, 533 U.S. 27, 31 (2001). The government has the burden of showing by a preponderance of the evidence that an exception to the Fourth Amendment warrant requirement exists. *United States v. Marshall*, 488 F.2d 1169, 1186 (9th Cir. 1973).

## III. Discussion

### A. Whether Traffic Stop Lacked Reasonable Suspicion

#### 1. Reliability of Tip

Defendant challenges the traffic stop as lacking reasonable suspicion as required by *Terry v. Ohio*, 392 U.S. 1 (1968). Applying the *Terry* standard to investigatory traffic stops, "a police officer may conduct an investigatory traffic stop if the officer has reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime." *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) (citation and internal quotation marks omitted). Officers have reasonable suspicion when "specific, articulable facts ... together with objective and reasonable inferences, form the

6

basis for suspecting that the particular person detained is engaged in criminal activity." *Id.* (citation and internal quotation marks omitted). The reasonable suspicion analysis takes into account the totality of the circumstances. A traffic violation alone is sufficient to establish reasonable suspicion. *Id.* (citing *Whren v. U.S.*, 517 U.S. 806, 810 (1996); *United States v. Willis*, 431 F.3d 709, 714-17 (9th Cir. 2005)).

The Supreme Court has held that reasonable suspicion does not exist where an officer can articulate only "an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Rather, reasonable suspicion exists only when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion. *United States v. Cortez*, 449 U.S. 411, 418 (1981); *United States v. Salinas*, 940 F.2d 392, 394 (9th Cir. 1991). In turn, particularized suspicion means a reasonable suspicion that the particular person being stopped has committed, or is about to commit, a crime. *Cortez*, 449 U.S. at 418.

Defendant argues that the 911 call about secondhand reports of witnesses seeing a man with a gun was not sufficiently reliable to support reasonable suspicion for an investigatory traffic stop. He contends that Witness 2 did not tell dispatch that he personally saw the gun on defendant, and that Witness 2 did not report the offense contemporaneously, because the sighting of the weapon took place sometime before Witness 2 called police.

Defendant also argues that reasonable suspicion could not be supported by evidence that was discovered after defendant had been stopped: Witness 2 later told police, after defendant was stopped, that he personally saw defendant lift up his shirt, exposing a black handgun located in his front waistband to a group of people in the parking lot. Doc. no. 15, Ex. 1 (Marcic Rpt.). Defendant also points out that Officers Colvin and Plummer claim that the dispatcher told them that the suspect had a gun "in his waistband," but the dispatch recording indicates that Witness 2 did not describe where the gun was located. Plummer Decl. ¶ 3; Colvin Decl. ¶ 4. The recording of the 911 call

7

reflects that Witness 2 reported that the suspect was carrying a pistol and that patrons had seen the gun on him, but when the dispatch operator asked Witness 2 where the gun was seen on the suspect, Witness 2 did not respond to that question because he suddenly saw the suspect start running.

Defendant contends that Witness 2's 911 call lacked predictive information or any indication that it was reliable in its assertion of illegality, like the anonymous tip found lacking sufficient indicia of reliability in *Florida v. J.L.*, 529 U.S. 266, 271-72 (2000). The Ninth Circuit has emphasized the need for tips to include predictions of future movements in order to prove reliable. *See, e.g., United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006) (where the court found the absence of probable cause to be so lacking from a search warrant affidavit that officers could not justifiably rely on it in executing the warrant because the tip from the DEA about a suspected drug chemist failed to provide any predictive information); and *United States v. Morales*, 252 F.3d 1070, 1076 (9th Cir. 2001) (where the court overturned a warrantless stop based on a tip and required that an anonymous tip "must predict the suspect's future movements").

Defendant cites an unpublished Ninth Circuit opinion holding that a tip was insufficient to support reasonable suspicion of criminal activity so as to justify a *Terry* stop. *United States v. Hollinquest*, 444 Fed. Appx. 118, 119 (9th Cir. Jul. 19, 2011). There, a hotel employee told the dispatcher that he had heard some people say that a man had a gun and told dispatch that the man was wearing a blue shirt, was in the parking lot, and had arrived there in a burgundy SUV. The tipster told police that the man had just pulled up to the hotel and that he had not brandished or displayed a weapon. The court held that this call was insufficient to establish reasonable suspicion of any past, present, or future criminal activity. *Hollinquest* is not controlling authority, and is distinguishable from this case in that the police in *Hollinquest* did not know that the informant was still at the scene when they arrived, and the informant never came forward personally and he was never interviewed. 444 Fed. Appx. at 120 n.1.

Here, the government has demonstrated that the 911 call by Witness 2 provided specific, articulable facts to support reasonable suspicion. Defendant correctly points out that Witness 2 did not tell the dispatcher that he personally saw the gun and that the dispatch recording disproves the officers' statements that they were informed by dispatch that the firearm was seen in the suspect's waistband. Plummer Decl. ¶ 3 and Colvin Decl. ¶ 4. However, Witness 2 informed dispatch that three customers reported seeing defendant with a gun on his person near the nightclub. These facts were sufficiently specific and articulable to form a particularized suspicion that defendant was brandishing a firearm or carrying a concealed weapon. *See* Opp. at 9; Marcic Rpt. Witness 2 was also able to give a general description of defendant, his clothing and the car that he was driving, as well as directing officers to the right car as defendant was driving away, to support a reasonable suspicion that the suspect driving the car was the person that was seen with a gun near a nightclub.

Another indication that the tip was reliable was that, unlike *J.L.,* the source of the 911 call was not anonymous. Witness 2 identified both his name and position, establishing the basis for how he would know that three different nightclub customers reported seeing the suspect carrying a gun. Witness 2 also called out to responding officers to point out defendant's car, and provided real-time information to dispatch about defendant's location and movements. Under the totality of the circumstances, even though Witness 2 did not tell dispatch that he also personally saw the gun on the suspect, this real-time information was sufficiently reliable for police to find reasonable suspicion of criminal activity to perform an investigative *Terry* stop. *See United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004) (where the caller identified his name to the 911 operator, "the recorded and transcribed initial 911 call narrowed the likely class of informants"). Even after the police engaged with defendant, Witness 2 repeated his name and provided his call back number to follow up with police.

### 2. **Wobbler Offense**

Defendant argues that the information provided to police only established reasonable suspicion that he had committed a wobbler, not a completed felony as required for a *Terry* stop. Reply at 5. Because the police stopped defendant for a past, completed misdemeanor offense, he argues that the relatively minor nature of the offense did not justify the warrantless stop, citing *United States v. Grigg*, 498 F.3d 1070, 1076 (9th Cir. 2007). In *Grigg*, police officers discovered an unregistered automatic firearm while conducting an investigative stop to determine whether Grigg was involved in the past noise violation alleged in a citizen's complaint filed earlier in the day. The court held that the traffic stop was not reasonable, but declined to adopt a per se standard that police may not conduct a *Terry* stop to investigate a person in connection with a past completed misdemeanor simply because of the formal classification of the offense. The court articulated factors to consider when reviewing a *Terry* stop based on reasonable suspicion that a past misdemeanor has been committed:

> We adopt the rule that a reviewing court must consider the nature of the misdemeanor offense in question, with particular attention to the potential for ongoing or repeated danger (e.g., drunken and/or reckless driving), and any risk of escalation (e.g., disorderly conduct, assault, domestic violence). An assessment of the "public safety" factor should be considered within the totality of the circumstances, when balancing the privacy interests at stake against the efficacy of a *Terry* stop, along with the possibility that the police may have alternative means to identify the suspect or achieve the investigative purpose of the stop.

*Grigg*, 498 F.3d at 1081. *See also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1175 (9th Cir. 2013) (holding that BART officer was not entitled to qualified immunity for pulling a Taser on suspects in misdemeanor battery and ordering them to be seated, where there was insufficient basis to conclude, from anything the officer witnessed, that there was a likelihood for "ongoing or repeated danger," or "escalation").

The government acknowledges that brandishing a weapon is punishable as either a felony or misdemeanor in violation of Penal Code § 417, as is carrying a concealed

10

firearm in violation of Penal Code § 25400. The government demonstrates under the *Grigg* test that the nature of carrying a concealed weapon or brandishing a firearm in public place does pose danger to the public and the risk of escalation, given the risk that the suspect could have pulled out his weapon on unsuspecting club patrons or against officers who were responding to the 911 call. Although defendant correctly points out that dispatch was told there was no report of a fight in public (Cal. Penal Code § 415) and that the suspect was driving away from the parking lot, the police had reasonable suspicion to do an investigative stop knowing that he was last seen with a gun and continued to pose a danger to the public. The fact that defendant went into another club for 10-15 minutes did not "substantially lessen" the probability that he still had the weapon, as he suggests, given the unlikelihood that he would abandon his firearm in a club and leave it there. Under the totality of the circumstances, the warrantless stop was not unreasonable.

### B. Whether *Terry* Stop Amounted to Arrest

Defendant contends that the police contact and aggressive tactics amounted to an arrest, not merely a *Terry* stop, and that the police lacked probable cause to arrest in violation of the Fourth Amendment.

Defendant argues that the aggressive methods used by the police were unjustified and that the traffic stop ripened into an arrest under the totality of the circumstances: defendant was ordered out of his car at gunpoint, with a police dog present; he was forced to lie face-down on the pavement; he was handcuffed; he was placed in the back of a police car while handcuffed. Reply at 6-7. Defendant argues that a reasonable person in these circumstances would not have felt free to leave, and that his detention amounted to a warrantless arrest. Reply at 6-8 (citing *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1176 (9th Cir. 2013)).

To determine whether a stop has turned into an arrest, a court must consider the totality of the circumstances. *United States v. Rousseau*, 257 F.3d 925, 929 (9th Cir. 2001) (citing *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir.1990)). In doing so, a

11

court considers both the intrusiveness of the stop (the aggressiveness of the methods used by police and the degree to which the suspect's liberty was restricted) and the justification for using such tactics (whether the officer had sufficient basis to fear for his or her safety warranting a more intrusive action). *Id.* (citing *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996); *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987)). "In short, the court decides whether the police action constitutes a *Terry* stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable given the specific circumstances." *Id.* (citations and internal marks omitted). In *Johnson,* the Ninth Circuit articulated that under some circumstances, "it is appropriate for an officer to use a level of force that would ordinarily bring to mind arrest" such as the following:

> (1) "where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight;"
> (2) "where the police have information that the suspect is currently armed;"
> (3) "where the stop closely follows a violent crime;" and
> (4) "where the police have information that a crime that may involve violence is about to occur."

*Johnson*, 724 F.3d at 1176 (quoting *Lambert*, 98 F.3d at 1189).

The government argues that the aggressive tactics used by the officers in detaining defendant were justified because they had reason to believe that he was armed and that they needed to ensure their safety as they continued their investigation. Doc. no. 28 (Surreply) at 6-7. Though the officers were not aware of defendant harming or threatening anyone, they knew he was seen carrying a pistol by three club patrons near a public place, and when the police approached him, he was argumentative and not compliant with the officers' commands, continuing to lower his hands and asking why he was being taken out of the car. *See* Colvin Rpt.

Defendant argues that he did not present a significant degree of danger, suggesting that certain indications presenting danger to police or others, such as harming

or threatening others or physically resisting officers, are required to find that intrusive or aggressive tactics were justified in a *Terry* stop. Reply at 9. Settled authority does not, however, require significant danger to allow police officers to protect themselves, but only reasonable suspicion warranting an investigative stop and reasonable steps to protect their safety. *Terry,* 392 U.S. at 24 ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."). The Supreme Court has recognized "that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." *United States v. Taylor*, 716 F.2d 701, 708 (9th Cir. 1983) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). Under controlling Ninth Circuit authority, "[t]he use of force does not convert the [investigatory] stop into an arrest if it occurs under circumstances justifying fears of personal safety." *United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir. 1990) (citing *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987) (investigatory stop did not amount to arrest where police officers forced suspects to exit car and lie down on pavement at gunpoint after prior warning that suspects were dangerous and a suspect disobeyed an order to raise his hands)). *See also United States v. Greene*, 783 F.2d 1364, 1367 (9th Cir. 1986) ("The fact that the officers told the men to put their hands on the car's headliner and then drew their weapons when appellant failed to comply did not necessarily transform the stop into an arrest.").

The government demonstrates that the officers' tactics for stopping and investigating defendant were reasonably based on concerns for personal safety, where a reliable witness was on the phone with dispatch reporting that defendant was seen with a gun by several people. The officers had this information that the suspect was armed before pulling over his car, and then determined after stopping him that he was uncooperative with verbal commands. Under these circumstances, approaching

defendant with guns drawn was reasonable to neutralize the risk of physical harm and to determine whether he was armed, until the officers could ensure that he was not carrying a weapon or presenting danger to their safety.

Because the *Terry* stop did not ripen into an arrest before the police completed their brief investigation, probable cause to arrest was not required.

### C. Whether the Warrantless Searches Were Unreasonable

Defendant contends that the warrantless search of his person and his car violated the Fourth Amendment.

#### 1. Basis for Pat-Down Frisk

Defendant argues that the police did not have any reliable information to justify a *Terry* frisk or pat-search for weapons. Reply at 10-11 (citing *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016) ("whereas a *Terry* stop is justified by reasonable suspicion that criminal activity may be afoot, a frisk of a person for weapons requires reasonable suspicion that a suspect "is armed and presently dangerous to the officer or to others."), *as amended*).

Here, the government has shown that the police had reasonable suspicion that defendant was armed, based on the 911 call with a witness who identified himself and reported that three people had seen defendant with a pistol on him and described the car that defendant was driving, giving guidance about the car's movements directly to an officer and to dispatch. The nature of this call supported reasonable suspicion that the suspect inside this car had a gun. Further, when defendant failed to comply initially with police commands, the police had further concern for threat to their safety while conducting their investigation.

#### 2. Automobile Search

Defendant also contends that the warrantless search of his car was not justified by either the "automobile exception" or a protective search. The court determines that under the circumstances presented here, the government has not demonstrated a fair probability that evidence of a crime would be found inside the car to support the

14

automobile exception to the warrant requirement. *United States v. Pinela-Hernandez*, 262 F.3d 974, 977-78 (9th Cir. 2001) (police may conduct a warrantless search of a vehicle if they have probable cause to believe that it contains contraband).

The government demonstrates, however, that the warrantless search was justified by reasonable suspicion to conduct a protective search under the holding of *Michigan v. Long*, 463 U.S. 1032 (1983). Opp. at 14-15. In *Long*, the Supreme Court held that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. at 1049. The Court in *Long* held that the officers who observed the defendant driving his automobile at excessive speed, and swerving into a ditch on a rural road at night, were clearly justified in searching the interior of the car after seeing a knife on the floorboard, supporting a reasonable belief that Long posed a danger if he were permitted to reenter his vehicle. The Supreme Court noted that in its earlier decision in *Adams v. Williams*, 407 U.S. 143 (1972),

> we held that the police, acting on an informant's tip, may reach into the passenger compartment of an automobile to remove a gun from a driver's waistband even where the gun was not apparent to police from outside the car and the police knew of its existence only because of the tip. Again, our decision rested in part on our view of the danger presented to police officers in "traffic stop" and automobile situations.

*Long*, 463 U.S. at 1048. In *Gant,* the Supreme Court summarized the holding of *Long* as "permit[ting] an officer to search a vehicle's passenger compartment when he has reasonable suspicion that an individual, whether or not the arrestee, is "dangerous" and might access the vehicle to "gain immediate control of weapons." *Arizona v. Gant*, 556 U.S. 332, 346-47 (2009) (citing *Long*, 463 U.S. 1032). *Gant* did not, however, address vehicle searches incident to a *Terry* stop, which the government refers to as a "vehicle

1 frisk," where the suspect is detained pending investigation and is able to return to his car
2 after the brief detention in the absence of probable cause to arrest.

3 At issue here is whether the police had a reasonable belief that defendant could
4 gain immediate control of weapons when he had been handcuffed and placed in a patrol
5 car during the search of the car.  Defendant argues that he did not pose a danger to
6 police to justify a protective search under those circumstances, citing an unpublished
7 opinion holding that the protective search of a car was premature because there was no
8 immediate risk that the driver or passenger would gain control of the weapons in the car
9 where the officers had secured the suspects, handcuffed them, and placed them away
10 from the car.  Reply at 13-14 (citing *United States v. Perryman*, 716 Fed. Appx. 594 (9th
11 Cir. Nov. 16, 2017)).  The court in *Perryman* acknowledged that although the officers
12 "may have reasonably believed that Perryman and his cousin [Anthony] were dangerous,
13 the evidence does not support the district court's conclusion that the officers reasonably
14 believed that Perryman or Anthony would gain immediate control of weapons in the car"
15 at the time the search was conducted.  716 Fed. Appx. at 595-96.  The court in *Perryman*
16 explained that when the suspects were handcuffed and detained for tinted windows and
17 driving with a suspended license, there was no risk that either suspect would gain
18 immediate control of weapons in the car: neither suspect could have driven the car away
19 because they both had suspended driver's licenses, and any other risk of danger was
20 speculative at that point because the police officers did not ask the suspects before
21 conducting the vehicle search if they would want to return to the vehicle and collect their
22 belongings.  716 Fed. Appx. at 596.

23 The *Perryman* decision is not binding and is distinguishable on the facts here,
24 where defendant did not have a suspended license and would have been able to re-enter
25 his car if the police concluded the investigatory stop after the pat-down search and
26 warrants check.  Sgt. Colvin explained in his declaration, "If officers had not located a
27 firearm on Vandergroen's person or vehicle, we would have allowed him to return to his
28 car, since he was not the subject of an outstanding arrest warrant.  If we did not search

16

the car before letting Vandergroen get back into it, he could have accessed the loaded firearm and used it against us." Colvin Decl. ¶ 10. This concern supports a reasonable belief that defendant could gain immediate control of a weapon inside the car if he were allowed to return to his car.

The parties cite no controlling authority on the question whether a protective vehicle search under *Long* is supported by reasonable suspicion that an individual who is handcuffed and held in a patrol car might gain immediate control of weapons inside the car after the officers complete the investigatory stop. The Fourth Circuit, however, has squarely addressed the issue whether reasonable suspicion to conduct a protective vehicle search is satisfied by the possibility that a suspect who is briefly detained during the traffic stop might gain immediate control of any weapons inside the vehicle when he is allowed to return to his car. In *United States v. Griffin*, 589 F.3d 148 (4th Cir. 2009), the court of appeals affirmed denial of the defendant's motion to suppress the firearm that was seized from his car during a *Terry* stop while the defendant was handcuffed and placed in the backseat of a patrol car. *Id.* at 151. Finding that the officers had a reasonable belief that the defendant might gain immediate control of any weapons inside the vehicle, the court reasoned as follows:

> Although Griffin was restrained in the backseat of the police vehicle at the time of the search, he was being detained at that time solely pursuant to the *Terry* stop. If Griffin had been released after the brief detention, as he presumably would have been, he would have regained access to his vehicle and any weapon inside.

*Id.* at 154 (citing *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) ("Such a protective search [under *Long*] is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested.")).

Applying the persuasive reasoning of *Griffin* here, the government has shown that the police officers had reasonable suspicion that defendant was dangerous and might gain immediate control of a weapon inside the car after the brief detention pursuant to the

17

*Terry* stop: an identifiable witness reported that a person matching defendant's description, who drove off in a car that the witness described and pointed out to a responding police officer, was seen by several people with a gun on him; no gun was found on defendant during a pat-down search; based on the officers' training and experience, they believed that the gun was probably inside the car; the officers reasonably suspected that if they allowed defendant to return to his car without searching the car for the gun that he was seen carrying, he could gain immediate access to the firearm inside the car. Under these circumstances, the police officers had reasonable suspicion to conduct a protective search of defendant's car. *Haynie v. Cty. of Los Angeles*, 339 F.3d 1071, 1076 (9th Cir. 2003) ("Police officers may search for weapons in the passenger compartment of an automobile if they have a reasonable suspicion based on 'specific and articulable facts' that a suspect is dangerous or may immediately gain control of weapons.") (citing *Long*).

## IV. Conclusion

For the reasons set forth above, defendant's motion to suppress is DENIED.

**IT IS SO ORDERED.**

Dated: August 24, 2018

_____
PHYLLIS J. HAMILTON
United States District Judge